CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
09/22/2017
JULIA C. DUDLEY, CLERK
BY: /s/ J. Jones
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| VERONIQUE M. NZABANDORA,<br><br>          *Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF VIRGINIA, *ET AL.*,<br><br>          *Defendants.* | CASE NO. 3:17-CV-00003<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

   This is an employment discrimination case against the University of Virginia ("UVA") and the Commonwealth of Virginia filed by a former nurse at UVA's medical center. Plaintiff Veronique Nzabandora asserts claims of racial and national origin discrimination, retaliation, and a hostile work environment related to her employment and termination. The parties have filed cross-motions for summary judgment.

   The facts viewed in Plaintiff's favor reveal that she was subjected to some harassing remarks during her employment. But Defendants have provided legitimate reasons for her termination, which Plaintiff has not shown are pretextual. First, Plaintiff refused to cooperate with an investigation into an alleged medication error. Second, during the course of that refusal, Plaintiff made remarks to her supervisor and an HR employee that those individuals (as well as high-level UVA administrators) interpreted as threats. For those reasons, Plaintiff's claims relating to her termination fail. Additionally, all but one of her claims not bearing directly on her termination must be dismissed as a matter of law.

   The hostile work environment claim, though, will proceed to trial. Defendants did not raise an argument for its dismissal in their opening brief, and Plaintiff's motion fails because—viewing the facts in Defendants' favor—no harassing or discriminatory statements were made.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Because there are cross-motions for summary judgment, the facts would usually be viewed twice: once in Plaintiff's favor when considering Defendants' motion, and vice versa. *Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). However, the Court recounts the facts only in Plaintiff's favor, because the grant of Defendants' summary judgment motion negates the need to consider Plaintiff's affirmative motion and construe the facts a second time in Defendants' favor. *E.g., Rossignol*, 316 F.3d at 523 (observing that grant of summary judgment to defendant necessarily resolves plaintiff's cross motion). The hostile work environment claim, however, is an exception to this approach because that claim is before the

Court only on Plaintiff's motion. Thus, the Court construes the facts in Defendants' favor during its analysis of that count. *See infra* Part IV.

**FACTS**

In 2014, Plaintiff was interviewed and hired as a nurse by Brenda Barrett, who became her supervisor. (Dkt. 63-1 at ECF 11–12; dkt. 63-4 ¶¶ 3, 5). According to Plaintiff, as of August 2015, she felt that Barrett gave her "everyday support," but that changed after Plaintiff "complained about discrimination." (Dkt. 63-1 at ECF 19).

The facts construed in Plaintiff's favor indicate that co-worker Brittany Abshire used racially charged language towards Plaintiff on occasions in the second half of 2015. In July and August 2015, Abshire called Plaintiff a stupid African immigrant and accused her of sitting on her "black ass." (Dkt. 75-2 at ECF 9–10, 14, 25). In September, Abshire told Plaintiff during work to stop sitting on her "black African ass" and occasionally stated she could not stand Plaintiff's "smelly food" and accent. (*Id*. at ECF 54). During this July-to-September period, Abshire also told Plaintiff to "go back where you came from." (*Id*. at ECF 59). Plaintiff reported this conduct to Barrett on July 5th and early September, respectively. (*Id*. at ECF 13).

In early September 2015, Plaintiff and Abshire became involved in a disagreement over medical protocol, requiring Barrett's intervention. (Dkt. 63-4). In an email, Plaintiff referenced bullying she experienced at the hands of Abshire. (*Id*.). Later that month, Plaintiff via email expressed gratitude to Barrett for her role in helping mediate the conflict with herself and Abshire. (Dkt. 63-1 at ECF 16–17).

This détente was short-lived. On September 28, 2015, Abshire claimed (and Plaintiff denied) that Plaintiff, during a disagreement, forcefully and demonstrably poked Abshire in the shoulder "multiple times" to make her point. (Dkt. 63-4 at ECF 25). Barrett consulted with

Human Resources (HR) about the matter and relied on two witnesses who, in written statements, supported Abshire's account of the event. (*Id*. at ECF 26–32). HR employee Jill Melton suggested "formal counseling" of Plaintiff, but Barrett provided Plaintiff a less severe notice requiring only "informal counseling," a notation which was not placed in Plaintiff's permenant file. (*Id*. at ECF 32, 40; dkt. 59-2 at ECF 150). Abshire received a more severe sanction of formal counseling for using profane language. (Dkt. 63-4 at ECF 6–7).

On November 2, 2015, Plaintiff sent a letter to UVA's president complaining about various work issues, including her prior incidents with Abshire, as well as Plaintiff's contention that her hours and pay were being cut. (Dkt. 63-2 at ECF 18–22). UVA Medical Center Director of Employee Relations, Veronica Ford, investigated the letter's allegations and found them to be without merit. (Dkt. 63-7 at ECF 1–2, 5–6).

On November 30, 2015, a doctor filed a "Be Safe" report after a patient complained she received the wrong medication. (Dkt. 63-4 at ECF 46). In consultation with HR and her supervisor, Barrett decided on December 4th to place Plaintiff on administrative leave pending the investigation. (*Id*. at ECF 49). This decision was relayed to Ford, who had investigated Plaintiff's prior complaints. (*Id*. at ECF 47–48).

On December 8th and at HR's request, Barrett called Plaintiff as part of the investigation to obtain her perspective on the alleged medication error. (Dkt. 63-4 at ECF 53). The call was unfruitful. Plaintiff generally refused to engage, and, among other things: stated she was a federal agent; asked "you don't know who you are doing this to, do you?"; and demanded to know if she was being fired. (*Id*. at ECF 52–53). Barrett relayed this information to Melton in HR, and the two tried again later that day to have a telephone conversation with Plaintiff.

On the second call, Plaintiff stated that she was giving Barrett and Melton "one last

chance" to do the right thing and stated, vaguely, "you see it every day in the media." (Dkt. 63-4 at ECF 11; dkt. 63-10 at ECF 7).[1] She said that Melton and Barrett "needed to be careful," and when Melton pressed Plaintiff to explain, she stated that they knew "what happens" when HR does the wrong thing. (Dkt. 63-4 at ECF 11; dkt. 63-10 at ECF 7). Plaintiff further advised the employees to ask God for forgiveness and that they "are going to be surprised." (Dkt. 63-10 at ECF 33).

There is contemporaneous, substantial, and uncontroverted evidence that Plaintiff's December 8th statements were interpreted as threats requiring swift and extensive action. Melton relayed the conversation via email immediately to her supervisor, Ms. Ford. (Dkt. 63-10 at ECF 33). Twelve minutes later, Ford responded that security would do more patrols around the area and test the panic buttons. (Dkt. 63-7 at ECF 7–8). The Medical Center's CEO immediately requested "security present at the [holiday] celebration events," saying that the situation "makes me very uncomfortable in light of the current events," which included (1) a mass workplace shooting during a holiday party in San Bernadino, California days before, and (2) the murder of television staff by a disgruntled employee in Roanoke a few months earlier.[2] The Vice President for Health Affairs agreed, writing that "[w]e must consider this a credible

---

[1] Plaintiff admitted to a University police officer she made these statements, explaining that they were not intended as threats and were misinterpreted. (Dkt. 63-9 at ECF 2, 7).

[2] The Court takes judicial notice that (1) on December 2, 2015, in San Bernadino California, two individuals—including an employee—murdered several workers at a service organization during a holiday party, and (2) on August 26, 2015, in Roanoke, Virginia, a disgruntled former television employee murdered a news reporter and cameraman on live television. Adam Nagourney *et al.*, *San Bernardino Shooting Kills at Least 14; Two Suspects Are Dead*, N.Y. Times (Dec. 2, 2015), https://www.nytimes.com/2015/12/03/us/san-bernardino-shooting.html?mcubz=1; John Woodrow Cox *et al.*, *Two Roanoke journalists killed on live television by angry former colleague*, Wash. Post (Aug. 26, 2015), https://www.washingtonpost.com/local/crime/two-roanoke-journalists-killed-on-live-television-by-angry-former-colleague/2015/08/26/8e534e0e-4c0c-11e5-902f-39e9219e574b_story.html?utm_term=.a8a7e97c79fa.

threat" and said that the administrators should "consider options" and "gather appropriate security personnel." (Dkt. 62-12 at 3).[3]

The next morning, December 9, 2015, the Vice President for Health Affairs forwarded Melton's email to the University-wide COO and stated that "[p]eople are on pins and needles." (*Id*. at ECF 5–6). UVA police launched an investigation, Virginia State Police provided extra security at the Medical Center, and local police patrolled the December 9th holiday party. (Dkt. 63-7 at ECF 2).

After this initial perceived threat subsided, HR employees Ford and Melton recommended that Plaintiff be terminated for (1) failing to cooperate with the medication error investigation, as she was ordered to do at the time of her administrative leave, and (2) threatening her immediate supervisor and an HR employee. Barrett agreed with this recommendation[4] and drafted a termination letter dated December 18, 2015, which Plaintiff received via mail on January 6, 2016. (Dkt. 63-4 at ECF 58–59). The letter recounted the two reasons for termination and also observed, by way of background, that the investigation had confirmed a medication error. Upon receipt, Plaintiff apparently interpreted this latter statement as the basis for her firing, so Barrett sent an amended termination letter in April 2016 that omitted mention of the medicine error investigation's finding. The second letter is otherwise substantively identical to the first, and both letters contain clear, up-front, unambiguous statements that Plaintiff was fired for failure to cooperate and for making threats. (*Compare id*. at ECF 58–59 with *id*. at ECF 60–61).

---

[3]    *See also* dkt. 75-2 at ECF 147 (CEO of HR's testimony that Plaintiff's comments were "very threatening and it was of great concern" for "the entire fifth floor o[n] which HR works").

[4]    Plaintiff agrees that Barrett was the final decision-maker. (Dkt. 75 at 12).

6

# ANALYSIS

Before turning to the substantive arguments, the Court must decide whether this is a case of direct and indirect evidence of discrimination, or rather one suited for the *McDonnell Douglas* framework.

Plaintiff offers a handful of statements by UVA employees she claims they made to her that constitute direct evidence of discrimination. The statements are as follows.

- <u>Chief HR Officer at the Medical Center (John Boswell)</u>: "[D]iscrimination has been at UVA for over 20 years."

- <u>Director for Neurosciences (Joel Anderson)</u>: "We have fired so many black nurses here, you are not going to be the first, you are not going to be the last one." "You need to stop [complaining or] you will be fired."

- <u>Employee Relations Manager at the Medical Center (Althea Howell)</u>: "[C]omplaining will never get you anywhere. Just go back to work and don't talk about it."

- <u>Plaintiff's supervisor (Brenda Barrett)</u>: "[L]ife is not fair, you need to get used to that." UVA "does not like people complaining about discrimination."

Defendants observe that none of these statements came directly from the alleged speaker. Plaintiff either did not depose the speakers or did not ask if they made these statements, and there is no written record of the statements. Instead, the statements all were attributed to the speakers by Plaintiff at her deposition. Defendants therefore argue they are inadmissible hearsay. Assuming *arguendo* that these statements are nonhearsay as statements of the declarant's then-existing state of mind (*e.g.*, motive and intent), Fed. R. Evid. 803(3), they are still insufficient to avoid resort to the *McDonnell Douglas* framework.

"To survive summary judgment on the basis of direct and indirect evidence, [a plaintiff] must produce evidence that [1] clearly indicates a discriminatory attitude at the workplace and must [2] illustrate a nexus between that negative attitude and the employment action." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999) (finding "a few isolated

statements indicating sexists attitudes" at company insufficient where plaintiff "utterly fails to connect" them with her eventual demotion and termination), *overruled on other grounds by Desert Palace v. Costa,* 539 U.S. 90 (2003); *see Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (holding that alleged discriminatory attitude must "bear directly on the contested employment decision"); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317–18 (4th Cir. 2005); *McCray v. Pee Dee Reg'l Transp. Auth.*, 263 F. App'x 301, 305–06 (4th Cir. 2008).

It "is the rare case in which an employer admits not just to possessing an impermissible motive, but also to acting upon it." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 n.6 (4th Cir. 2015). Relevantly, "[i]solated remarks unrelated to the challenged employment decision are insufficient to provide direct evidence of discrimination." *Finkle v. Howard Cty.*, 640 F. App'x 245, 248 (4th Cir. 2016). If relied upon, isolated statements "must be contemporaneous to the adverse employment action." *McCray*, 263 F. App'x at 306. The statements here fail these principles because they either are isolated, do not reveal "clearly indicate[] a discriminatory motive," are unconnected to Plaintiff's termination, or some combination thereof.

Boswell. Boswell's generic comments about historical discrimination at UVA do not demonstrate racial, national origin, or retaliatory animus towards Plaintiff. Even if they did, there is no nexus, because Boswell—as Plaintiff concedes—had no role in firing Plaintiff. (Dkt. 75 at 13). His statements do not "bear directly" on her termination. *Warch*, 435 F.3d at 520.

Anderson. Anderson's comments may indicate a discriminatory attitude. But he oversaw the neurosciences department. There is no evidence on which a reasonable person could find a nexus between Anderson's alleged statements and Plaintiff's termination. *Barrett* fired her after agreeing with the recommendation of two HR professionals, Ford and Melton (although

Anderson apparently reviewed the termination letter as to form), so his statements do not "bear directly" on the decision to terminate Plaintiff. *Warch*, 435 F.3d at 520. The fact that Anderson's alleged statement occurred a month before Plaintiff was terminated[5] (indeed, before she was even placed on leave pending the medication error investigation) further supports this conclusion. *See McCray*, 263 F. App'x at 306

Howell. Howell's statement is a general admonition to stop complaining and "go back to work." It neither "clearly indicates" a discriminatory attitude nor has a nexus to Plaintiff's termination, as Howell did not make or influence the decision. *Brinkley*, 180 F.3d at 608.

Barrett. Finally, Barrett, who was the decision-maker, offered general admonitions about fairness and stated UVA purportedly did not like reports of discrimination. These generalized comments are not indicative of a discriminatory attitude by Barrett, but even if they were, there is no nexus: The statements are isolated ones allegedly made to Plaintiff three months prior to her termination, not contemporaneously with it. *See McCray*, 263 F. App'x at 306 (finding "I can't stand that black son of a bitch," "black S.O.B," and "first chance we get we are going to run his ass out of town" not sufficient to avoid resort to *McDonnell Douglas* framework).

In sum, this is not the "rare case" in which Plaintiff can proceed without the *McDonnell Douglas* framework. *See Foster*, 787 F.3d at 250 n.6.[6]

## I. Racial/National Origin Discrimination under Title VII

Defendants offer two overarching arguments against the Title VII discrimination claim. First, Plaintiff does not make out a *prima facie* case because she failed to meet legitimate job expectations. Second, they assert there were legitimate, non-pretextual reasons to fire Plaintiff.

---

[5] Dkt. 75 at 6.

[6] Plaintiff also cites statements by Abshire, but she was merely Plaintiff's co-worker, not her supervisor or the decision-maker.

9

### A. *Prima facie* case

To establish a *prima facie* case, Plaintiff must show that "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).

Defendants argue that Plaintiff was not satisfying her legitimate job expectations because she physically assaulted co-worker Abshire and refused to cooperate with the investigation into the medication error. They also cite evidence that Plaintiff refused to work as a "charge nurse" overseeing other nurses during designated shifts. Specifically, they refer to an email in which Plaintiff wrote to Barrett on November 6, 2015 that, due to personal schedule changes, "I am no longer able to be a charge [n]urse on the new schedule" and "I am OK to not doing [*sic*] Charge Nurse." (Dkt. 63-4 at ECF 45).[7]

Plaintiff's response on this score is scant, consisting of only marginally relevant statements from Barrett and her supervisor that, on certain occasions predating her termination, Plaintiff had received good performance reviews. (Dkt. 75 at 16–17). "Hospitals," though, "have historically had wide discretion to make decisions regarding their medical staff." *Freilich v. Upper Chesapeake Health, Inc.,* 313 F.3d 205, 218 (4th Cir. 2002); *see Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006) (expressing disinclination "to impugn" hospital's judgment about quality of cardiologist's work). Moreover, Plaintiff does not contest the authenticity of her email declining to work as a charge nurse.

---

[7] Regarding the fourth aspect of a *prima facia* case, Defendants also contend that Plaintiff has not identified a similarly-situated comparator, stating that she cannot identify anyone terminated for threatening a supervisor and refusing to cooperate with an investigation. (Dkt. 63 at 18–19).

In any event, the Court can at this stage assume Plaintiff establishes a *prima facie* case because Defendants have established legitimate reasons for her termination.

B. **Legitimate, non-pretextual reasons for termination**

Defendants assert two legitimate reasons for terminating Plaintiff: her refusal to participate in the medication error investigation, and the perceived threats she made to Barrett and Melton.

Plaintiff must show that both of these reasons are pretextual, that is, that they were not the true basis of her termination and that discrimination was an actual reason. *See Baldwin v. England*, 137 F. App'x 561, 564 (4th Cir. 2005) (Plaintiff failed to show "any of those reasons are false, much less that all of them are a pretext"); *Odom v. Int'l Paper Co.*, 652 F. Supp. 2d 671, 691 (E.D. Va. 2009) *aff'd sub nom. Odom v. Int'l Paper Co.*, 381 F. App'x 246 (4th Cir. 2010) (Plaintiff must "meet each reason head on and rebut such reason"). Plaintiff "may not recast an employer's legitimate, non-discriminatory reason or substitute his business judgment for that of the employer, but must instead meet each reason head on and rebut such reason." *Monk v. Potter*, 723 F. Supp. 2d 860, 881 (E.D. Va. 2010), *aff'd sub nom. Monk v. Donahoe*, 407 F. App'x 675 (4th Cir. 2011).

Plaintiff's primary argument is that she was terminated for committing the medication error. This argument is not supported by the evidence, as it rests on an idiosyncratic misreading of the plain text of Plaintiff's termination notice.

1. **Supposed "changing reasons" for termination**

First, faced with overwhelming and uncontroverted evidence that UVA employees took Plaintiff's comments in early December as serious threats, Plaintiff casts the reasons for terminating her as shifting over time. (Dkt. 75 at 19). Citing her termination letter, Plaintiff

states she was "terminated for having committed a medication error." (*Id*. at 19).

No reasonable juror could draw that conclusion from the letter. Its very first sentence states plainly:

> Veronique Nzabandora is being terminated *for threatening and intimidating employees* of the Medical Center *and for failing to perform responsibilities as reasonably requested, assigned, or directed*[,]which are violations of [Medical Center policies].

(Dkt. 75-2 at ECF 173 (emphasis added)). The letter next explains, in a single paragraph, what the originating investigation was about: It describes the preliminary finding that a medication error in fact occurred and the efforts to seek Plaintiff's side of the story. This is mere factual background, as the remaining five paragraphs recount in detail the events resulting in Plaintiff's termination: her refusal to cooperate and her threatening statements. Plaintiff even admitted in her January 12, 2016, EEOC charge she was terminated "for allegedly not participating in an investigation and alleged threatening behavior." (Dkt. 75-3 at ECF 5).

Nonetheless, Plaintiff soldiers on, citing the subsequent April 2016 version of her termination letter for the proposition that "Barrett withdr[ew] the original termination letter and issue[d] another one scratching out the medication error." (Dkt. 75 at 19). This is incorrect. Barrett did not change the substance of the letter: Both stated clearly the reasons for Plainitff's termination, neither of which were that she committed a medication error. The first sentence reads precisely the same as in the original letter. Indeed, the two letters are substantively identical.

The only difference is that the second letter omits—apparently in response to Plaintiff's own misinterpretation of the first letter—background information mentioning preliminary evidence of a medication error, and in its place substituted the statement "at this point [*i.e.*, December 4, 2015, when Plaintiff was placed on leave pending the investigation], the need for

any disciplinary action had not been determined." (Dkt. 75-2 at ECF 171). The remainder of the second letter was unchanged, again focusing in great detail on Plaintiff's misconduct—her threats and refusal to cooperate.

In sum, Plaintiff simply misreads the content of her termination notices, and no reasonable juror could adopt her misunderstanding. She can rely only on her own bald assertion that "UVA changed its reasons for firing" in an attempt to manufacture pretext. (Dkt. 75 at 12).[8] That is insufficient to defeat the overwhelming and unrebutted evidence that Plaintiff made what Barrett (the decision-maker) and other UVA employees—including upper-level management—interpreted as threats against co-workers and refused to participate in an investigation regarding a medication error she committed. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (holding that, when assessing pretext, it "is the perception of the decisionmaker which is relevant."); *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006) (declining to impugn medical professionals' judgment about employees).

### 2. Discriminatory comments as pretext

Next, Plaintiff relies on statements purportedly made by Barrett (*i.e.*, UVA dislikes discrimination complaints) and Anderson (*i.e.*, UVA has fired black nurses before and Plaintiff would not be the last one) that "show pretext for discrimination." (Dkt. 75 at 20). Plaintiff does not cite any cases or engage in analysis explaining why these isolated statements show pretext.

As explained above, Plaintiff must—but fails to—rebut each reason for her termination

---

[8] Plaintiff also offers an affidavit from a nurse who claims Barrett told her that Plaintiff was fired for a medication error. (Dkt. 71 at 11 (citing dkt. 75-1 at ECF 11 ¶ 4)). This is hearsay excludable from consideration on summary judgment. Fed. R. Civ. P. 56(c); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993). Even if it was not, no reasonable juror could credit this single statement in light of the compelling and contemporaneous evidence documenting Plaintiff's threatening statements and refusal to cooperate.

13

head on. *Baldwin*, 137 F. App'x at 564; *Odom*, 652 F. Supp. 2d at 691; *Monk*, 723 F. Supp. 2d at 881. Additionally, the Court has already explained why Anderson's and Barrett's comments do not aid Plaintiff. As to Anderson (whose comments came a month before Plaintiff's suspension and eventual termination), he did not make the decision to fire Plaintiff; Barrett did. So his statements cannot show that Barrett's reasons were pretextual. For Barrett's part, the comments allegedly attributed to her by Plaintiff were made three months before the termination (and the conduct justifying it) and do not suggest Plaintiff's race or national origin played a role in the decision. Further, when, as here with Barrett, "the hirer and firer are the same individual, there is a powerful inference relating to the ultimate question that discrimination did not motivate the employer." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991); *see Evans*, 80 F.3d at 959; *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995). That inference is not overcome here.

### 3. Unequal treatment of purported comparators

Finally, Plaintiff contends there is pretext because she has identified white employees who were not terminated for committing medication errors. (Dkt. 75 at 20–21). This argument attacks a straw man: The grounds for her termination was not a medication error. The argument fails for the reasons discussed above.

## II. Retaliation under Title VII

"To establish a *prima facie* case of retaliation in contravention of Title VII, a plaintiff must prove (1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (*en banc*) (internal quotations omitted). If this is shown:

> [t]he burden then shifts to the [defendant-employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. If the employer makes this showing, the burden shifts back to the plaintiff to rebut the [defendant-employer's] evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination.

*Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (internal quotations and citations omitted).

The "burden for establishing causation at the *prima facie* stage is 'less onerous'" than the causation test at the third step (pretext) of the analysis. *Foster*, 787 F.3d at 251. Yet at the pretext stage, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct," which is effectively a "but-for" standard. *Id.* at 252. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); *see Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (Retaliation claims "require the employee to show that retaliation was a but-for cause of a challenged adverse employment action.").

Furthermore, courts are not called upon to judge "whether the reason was wise, fair, or even correct, ultimately." *Dugan v. Albemarle Cty. Sch. Bd.*, 293 F.3d 716, 722 (4th Cir. 2002). If the record shows the defendants "honestly believed" plaintiff deserved to be discharged or sanctioned, then pretext is absent, even if the defendants were wrong or mistaken about the underlying facts. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217–18 (4th Cir. 2007).

Defendants first argue that Plaintiff does not make out a *prima facie* case because her complaints to various individuals about the treatment she endured were too remote in time to her termination, and thus not causally connected to it. (Dkt. 65 at 23). The Court assumes that a *prima facie* case has been made out as it pertains to her termination, as Plaintiff lodged several

complaints throughout the second half of 2015 about treatment she found objectionable. (*See* dkt. 75 at 21–23).

Plaintiff, then, must show that Defendants' stated reason for adverse action are "prextext for discrimination," meaning that she needs proof "*both* that the reason was false, *and* that discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377–78 (4th Cir. 1995) (emphasis in original).

As discussed above, Defendants had legitimate, non-pretextual reasons for firing Plaintiff. Plaintiff's argument on the retaliation score is brief and merely recapitulates her prior, unsuccessful arguments. (Dkt. 75 at 24–25).

\*     \*     \*

Plaintiff's opposition brief—in recounting the facts—alludes to retaliatory acts other than termination. Plaintiff does not formulate additional legal arguments based on these facts, but out of an abundance of caution they will be addressed.

<u>Reduced hours, withheld pay, and charge nurse duties</u>. Plaintiff contends that after her various complaints of discrimination throughout late 2015, Barrett reduced her hours and withheld her full pay for September, and that she was not permitted to work as a charge nurse. (Dkt. 75-2 at ECF 18, 64, 162; *see* dkt. 75 at 3–4, 23–24).

As for the hours and charge nurse duties, Director of Employment Relations Ford investigated these allegations and found them in November 2015 to be "false" (dkt. 63-7 at ECF 5–6), a finding on which Defendants were entitled to rely and Plaintiff does not show is pretextual. Indeed, Plaintiff's timesheets for August 29, 2015 through December 2015 reveal that Plaintiff's hours were not reduced and that she served as a charge nurse throughout September, October, and November 2015. (Dkt. 73-7 at ECF 1–2, 5–10, 19–24). In other words,

Plaintiff suffered no material adverse action that might dissuade a reasonable worker from making a charge of discrimination, because she did not sustain an objectively nontrivial "injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006); *see Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (requiring "some direct or indirect impact on an individual's employment"); *see also S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 79 (4th Cir. 2016) (finding plaintiff cannot meet his burden on a Title VII claim "[w]ithout more than his own assertions").

Regarding the allegations about nonpayment, a system-wide accounting error was uncovered and remedied. (Dkt. 63-7 at ECF 5–6; dkt. 73-7 at ECF 3–4, 19–24; dkt. 75-4 at ECF 2; dkt. 76-7). Plaintiff admitted this correction was made, a conclusion Ford also reached. (Dkt. 75-2 at ECF 64–65; dkt. 63-7 at ECF 5–6; dkt. 75-2 at ECF 162). Again, then, Plaintiff did not suffer a materially adverse employment action. *White*, 548 U.S. at 67–68; *Adams*, 789 F.3d at 431; *S.B. ex rel. A.L.*, 819 F.3d at 79. Even if the initial nonpayment was materially adverse, there was a nonpretextual reason for it: The mistake was caused by a widespread accounting error attributed to a change in UVA's computer system, not retaliatory animus against Plaintiff. (Dkt. 64-7 at ECF 3–4).

<u>Placement on leave</u>. Plaintiff complains she was twice placed on leave after she voiced her opposition to discrimination. (Dkt. 75 at 23). But she has not offered evidence sufficient to rebut the nonpretextual reasons for this leave: that the first leave was justified as an interim measure after allegations (supported by two witness) that she assaulted a co-worker (*e.g.*, dkt. 59-2 at ECF 150), and the second was justified pending an investigation into an alleged medication error.[9] It also appears (and Plaintiff does not argue to the contrary) that short-term

---

[9] "When an employee is put on paid administrative leave pending an investigation for

paid administrative leave pending a timely investigation may not constitute materially adverse employment action. *See Sturdivant v. Geren*, No. CIV.A. 1:09-CV-586, 2009 WL 4030738, at *6 (E.D. Va. Nov. 19, 2009) ("courts have held that placing an individual on paid administrative leave does not constitute an adverse employment action"), *aff'd sub nom. Sturdivant v. McHugh*, 450 F. App'x 235 (4th Cir. 2010); *Grice v. Baltimore Cty., Md.*, No. CIV. JFM 07-1701, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008) (compiling cases supporting proposition that "suspension with pay pending a prompt investigation into allegations of wrong-doing does not constitute an adverse employment action"), *aff'd*, 354 F. App'x 742 (4th Cir. 2009).[10]

## III. Race Discrimination under 42 U.S.C. § 1981

The Commonwealth of Virginia's (and by extension, UVA's) Eleventh Amendment immunity bars this claim. *Huang v. Bd. of Governors of Univ. of N. Carolina*, 902 F.2d 1134, 1136 n.1, 1138 (4th Cir. 1990); *Collin v. Rector & Bd. of Visitors of Univ. of Virginia*, 873 F. Supp. 1008, 1013 (W.D. Va. 1995); *Demuren v. Old Dominion Univ.*, 33 F. Supp. 2d 469, 475 (E.D. Va.), *aff'd*, 188 F.3d 501 (4th Cir. 1999); *Wilson v. Univ. of Virginia*, 663 F. Supp. 1089, 1092 (W.D. Va. 1987).

---

wrongdoing, the employer will virtually always have a ready, legitimate and non-discriminatory reason for doing so; few employers will, out of animus, inflict a paid vacation." *Joseph v. Leavitt*, 465 F.3d 87, 96 (2d Cir. 2006) (Jacobs, J., concurring).

[10] This Court has been unable to find a Fourth Circuit precedent squarely addressing this issue. *See Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) *abrogated on other grounds by White*, 548 U.S. at 56–57, 60. A number of courts of appeals hold that, barring a departure from or unreasonable application of standard procedures (which is not applicable here, dkt. 59-2 at ECF 150), paid administrative leave pending an investigation is not adverse action. The Second Circuit, for instance, has applied this principle even after the Supreme Court's *White* decision, which clarified the standard for adverse action in retaliation claims. *Joseph v. Leavitt*, 465 F.3d 87, 90–92 & n.2 (2d Cir. 2006) (citing cases from the Fifth, Sixth, and Eighth Circuits); *e.g., Brown v. City of Syracuse*, 673 F.3d 141, 144, 148, 150–51 (2d Cir. 2012); *see also Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325 (3d Cir. 2015) (applying principle to substantive Title VII claims; not reaching question as to Title VII retaliation claims).

## IV. Hostile Work Environment Claim

Finally, there is the matter of Plaintiff's hostile work environment claim. Defendants' motion seeks judgment on and dismissal of the "entirety" of Plaintiff's claims (dkt. 62), but their opening brief does not mention the hostile work environment claim. (*See generally* dkt. 63). The claim is instead addressed in Defendants' reply brief. (Dkt. 76 at 21–25). This failure to present argument in an opening brief renders any attack on the hostile work environment claim waived, as innumerable cases hold. *E.g.*, *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 249 (4th Cir. 2013); *United States v. Hudson*, 673 F.3d 263, 268 (4th Cir. 2012); *Nelson v. Green*, No. 3:06-CV-00070, 2014 WL 131055, at *20 (W.D. Va. Jan. 14, 2014); *RMA Lumber, Inc. v. Pioneer Mach., LLC*, No. CIV.A. 6:08-CV-00023, 2009 WL 3172806, at *5 (W.D. Va. Oct. 1, 2009).

Plaintiff's motion for affirmative summary judgment fairs no better. While Plaintiff properly raised her argument (albeit with minimal analysis, dkt. 59 at 27–28), there is a dispute of material fact. Most obviously, Defendants' employees uniformly deny making the discriminatory or harassing statements that Plaintiff asserts they made. (Dkt. 73 at 2–3 (citing affidavits and deposition testimony)). If a jury—as it reasonably could—resolved this dispute in Defendants' favor, the first three elements of a hostile work environment claim would be absent. *See Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 221 (4th Cir. 2016). Thus, Plaintiff is not entitled to judgment as a matter of law. This claim will proceed to trial.

## SUMMARY

Based on the foregoing, Defendants' motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied. All claims except Plaintiff's hostile work environment claim will be dismissed.

An appropriate order will issue. The Clerk of the Court is hereby directed to send a certified copy of this opinion and the accompanying order to counsel of record.

Entered this  22nd  day of September, 2017.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE