CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
10/24/2017

JULIA C. DUDLEY, CLERK
BY: /s/ J. Jones
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| VERONIQUE M. NZABANDORA,<br><br>            *Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF VIRGINIA, *ET AL.*,<br><br>            *Defendants.* | CASE NO. 3:17-CV-00003<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

  This is an employment discrimination case against the University of Virginia ("UVA") and the Commonwealth of Virginia. I previously granted in part Defendants' motion for summary judgment, dismissing Plaintiff Veronique Nzabandora's claims for discriminatory termination under Title VII, retaliation under Title VII, and racial discrimination under 42 U.S.C. § 1981. (Dkts. 81, 82). I also held that a hostile work environment theory could proceed to trial. (*Id.*). Defendants then filed, with leave, an additional dispositive motion under either Rule 12(c) or Rule 56, seeking dismissal of that theory. (Dkts. 91, 92).

  That motion is now ripe. (Dkt. 103). Although styled as a summary judgment motion, Defendants' brief contains argument based on both the pleadings and the evidentiary record. The Court hence evaluates the motion against either the judgment-on-the-pleadings standard or the summary judgment standard, as the situation warrants. The parties are familiar with the facts and analysis in the prior summary judgment opinion, so they are repeated only as necessary.

  The Court holds that Plaintiff's complaint alleged facts sufficient to establish a hostile work environment theory. The evidence, though, cannot support a finding of liability against Defendants. Most centrally, Plaintiff cannot demonstrate that the supposed hostile environment is legally imputable to Defendants. Thus, the motion will be granted and the case dismissed.

1

I.   **JUDGMENT ON THE PLEADINGS**

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A party also may raise a Rule 12(b)(6) motion to dismiss for failure to state a claim as a Rule 12(c) motion. Fed. R. Civ. P. 12(h)(2). The standard of review for either motion is the same—the Court must in each instance construe the facts and reasonable inferences of the pleadings in Plaintiff's favor. *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 702 (4th Cir. 2016); *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).

   A.   **Rule 10(b)—Claims in Separate Counts**

Rule 10(b) states that "[i]f doing so would promote clarity, each *claim* founded on a separate transaction or occurrence . . . must be stated in a separate count." (emphasis added). Defendants first contend that Plaintiff's operative complaint "failed to assert a hostile work environment claim as a separate count." (Dkt. 93 at 7). This argument is unconvincing because a hostile work environment—although commonly referred to as a freestanding claim—is simply a theory of establishing a discrimination claim. As a result, it need not be separately pled.

"Title VII renders it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276–77 (4th Cir. 2015) (quoting 42 U.S.C. § 2000e–2(a)(1)). In 1986, the Supreme Court recognized that this portion of Title VII—the antidiscrimination provision—could be violated when an employer fosters or permits a work environment that is hostile to a protected characteristic. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 73 (1986). But there is nothing special (insofar as pleading a "claim" is

concerned) about such a scenario: It just describes a fact-pattern or theory, proof of which establishes a violation of the antidiscrimination provision in § 2000e–2(a)(1). *Boyer-Liberto*, 786 F.3d at 276–77 ("An employer contravenes § 2000e–2(a)(1) by, *inter alia*, requiring an African–American employee to work in a racially hostile environment."). Put differently, Title VII does not include a "hostile work environment" provision, but instead an antidiscrimination provision that can be transgressed by the existence of such an environment. This is akin to the colloquial label applied to "slip-and-fall" cases: There is no such thing as a slip-and-fall *claim*, just *negligence claims* premised on slip-and-fall fact-patterns.

Other courts agree that a hostile work environment theory is not a freestanding claim under Title VII.

> The parties in this case sometimes refer to these two separate theories or grounds for Title VII liability as "claims" or "causes of action"—calling them, for example, the "hostile work environment claim" and the "tangible employment action claim." Whether use of this language contributed to or instead exemplifies [defendant's] confusion, [defendant] is confused. It insists that the reason it did not address [plaintiff's] tangible employment action theory in its summary judgment motion is that she never pleaded that theory as a separate "claim" in her complaint.
>
> In her pleading . . . [plaintiff] did enough. *She was not required to plead tangible employment action as a separate claim, because it is not a separate claim*. "Tangible employment action" is a *label* used to describe one of two ways sexual harassment can rise to the level of violating Title VII. In *Ellerth,* the Supreme Court explained that labels like "tangible employment action" and "hostile work environment" are relevant only "to the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." 524 U.S. at 753, 118 S.Ct. at 2265. *When courts refer to the two types of conduct or fact patterns in cases, or theories of liability, as different types of "claims," they are using the word "claim" as a shorthand—and potentially confusing—way of describing how the plaintiff contends that the employer is vicariously liable under Title VII*. When we talk about tangible employment action and hostile environment, what we are or should be talking about are the two alternative ways a plaintiff may establish a basis for the employer's vicarious liability. . . .

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245–46 (11th Cir. 2004) (emphasis added).

Likewise:

> Courts classify sexual harassment as either hostile work environment sexual harassment or quid pro quo sexual harassment. These categories, however, do not reflect statutory proscriptions that separate "harassment" from other forms of discrimination. Rather, these labels, to the extent that they are useful at all, are so merely as descriptions of varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment.

*Briggs v. Water*, 484 F. Supp. 2d 466, 484 (E.D. Va. 2007) (internal citations and quotations omitted).[1]

In fairness to Defendants, the Complaint is not a model of precision. But it does include claims (Counts I and II) for racial and national origin discrimination under Title VII, both of which incorporate by reference all prior allegations. (Dkt. 10 at ECF 15–17). Defendants contend that—because the Court dismissed Plaintiff's claims for retaliation (Count III) and discrimination under 42 U.S.C. § 1981 (Count IV), and because only those counts specifically mention a "hostile work environment"—Plaintiff has no hostile work environment "claim" left. Relatedly, they observe that neither Count I nor Count II include the phrase "hostile work environment." (Dkt. 93 at 9). "That is true, but it does not matter." *Hulsey*, 367 F.3 at 1246. "In light of the earlier specification of the factual details" in the Complaint incorporated by reference into Counts I and II, Plaintiff has done enough to at least raise the specter of a hostile work environment theory based on race and national origin. *Id*. at 1247. "While it may well be preferable to plead different theories of recovery in separate counts, it is not required. Nor is there any requirement that they be pleaded in separate paragraphs. [Plaintiff's] complaint adequately sets forth her [various] theories of recovery under Title VII." *Id*.

---

[1] Defendants reliance on *Shonk v. Fountain Power Boats*, 338 F. App'x 282, 287 (4th Cir. 2009) is unfounded. That case involved claims against three defendants for breaches of product warranties where each product was manufactured by a different defendant. That is to say, there were three claims (one against each defendant), each pertaining to a separate product.

B. **Failure to State a Claim**

Next, Defendants argue that the Complaint fails to allege facts satisfying the elements of a hostile work environment. (Dkt. 93 at 10–12). Defendants are mistaken. The Complaint alleges that, between July and September 2015, Plaintiff's coworker Brittany Abshire: called Plaintiff "a stupid black African immigrant" or "stupid immigrant" who took American jobs; screamed at her to stop sitting on her "stupid black ass"; imitated or criticized her Rwandian accent, food, and culture; urged her to "go back where you came from"; and belittled her abilities. (Complaint ¶¶ 19, 22, 24–25, 29–30, 49). There are ample allegations that Plaintiff reported this behavior to her supervisors. (*Id*. ¶¶ 20–21, 26, 32–33, 46, 67). This easily establishes a Title VII hostile work environment. *Boyer-Liberto*, 786 F.3d at 271.[2]

## II. SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.

---

[2] Defendants also assert Plaintiff cannot base a hostile work environment on actions she also alleges were retaliatory. There are three shortcomings with this position. First, the cases cited by Defendants in support of this argument are nonbinding (and mostly out-of-circuit) district court cases. Second, it is not clear at all, as Defendants presume, that the Complaint contends that harassing remarks were also retaliatory. Third, in an attempt to prove that point, Defendants cite to Plaintiff's deposition testimony. But that exceeds the scope of the Complaint and thus is not proper for a Rule 12(b)(6) motion.

2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

A hostile work environment theory requires proof of (1) unwelcome conduct, (2) based on the relevant protected characteristic, (3) which is sufficiently severe or pervasive to alter the conditions of employment, and is (4) imputable to the employer. *Boyer-Liberto*, 786 F.3d at 271. The focus here is on the third and fourth elements.

### A. Severe or Pervasive Conduct

Defendants dismiss the remarks at issue in this case as "infrequent, isolated, and stray remarks" that were merely "professional frustrations." (Dkt. 93 at 14–16). This minimizes the offensive and repetitive nature of Abshire's comments. Taking Plaintiff's deposition testimony at face value, coworker Abshire lobbed a barrage of derisive and demeaning insults at Plaintiff over a three-month period from July to September 2015. Similar to what is alleged in the Complaint, Plaintiff testified Abshire accosted her as a "stupid black African immigrant," "stupid African immigrant," or "black African"; chided her for sitting "on [her] black ass" and her "black African ass"; told her to "go back where you came from," and; derided her African accent and "smelly food." (Dkt. 75-2 at ECF 9–10, 13–14, 54, 59). These statements—which Plaintiff told Abshire she did not welcome—occurred "frequently" or "multiple times"; "destroyed" and discouraged Plaintiff during her job; and drove her to tears in the workplace. (*Id.* at ECF 13–14, 54, 59). Considering the totality of these facts together, Plaintiff could have "reasonably

6

perceived the work environment to be abusive." *Guessous*, 828 F.3d at 226–27 (finding hostile environment where there discriminatory conduct and remarks were frequent, plaintiff's work performance was interfered with, and her reaction implied her "psychological well-being was at risk").

B.     **Attribution to Employer**

When a coworker, like Abshire,[3] creates a hostile environment, liability is imputed to the employer only when it is "negligent in controlling working conditions." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). This means an employer must know "or should have known about the harassment and failed to take effective action to stop it." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008). "Once an employer has notice, then it must respond with remedial action reasonably calculated to end the harassment." *Id*. (internal quotations omitted).

Defendants satisfied this standard. The record indicates that Plaintiff complained in September 2015 to her supervisor, Barrett, about Abshire's comments. Yet Barrett responded by instructed her staff "to avoid scheduling Plaintiff and Ms. Abshire to work during the same shift." (Dkt. 93-5 ¶ 25; *see id*. ¶¶ 6–10; dkt. 76-6 ¶¶ 20–25). Subsequently, the two nurses did not encounter each other (except occasionally during shift changes or during a handful of

---

[3]     Despite labeling Abshire a coworker in the Complaint, Plaintiff now characterizes her as a supervisor on the theory she occasionally served as a "charge nurse" overseeing other nurses. (Dkt. 96 at 19). But an employee is a supervisor under Title VII law only when she is "empowered . . . to take tangible employment actions against the victim, . . . such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013). Plaintiff does not point to anything in the record indicating this is so with a charge nurse. (*See* dkt. 96 at 19). Indeed, the Court's understanding of the record is that duty as a charge nurse in Plaintiff's department involves only low-level administrative duties distributed among many nurses on a rotating basis. *See Vance*, 133 at 2443 (rejecting "ability to exercise significant direction over another's daily work" as test for supervisory status).

overlapping hours in October and December 2015). (Dkt. 93-5 ¶ 25).

In her response, Plaintiff does not identify any evidence disputing that Barrett took this remedial action. (*See* dkt. 96 (Pl's Br.) at 18–20). Just as significantly (and as explained earlier), Abshire's comments took place between only July and September 2015. That is to say, the facts indicate that Barrett's decision to keep Plaintiff and Abshire on separate shifts quashed Abshire's harassment. This conclusion comports with the findings of UVA's internal investigation into Plaintiff's complaints, conducted by the Director of Employment Relations. (Dkt. 63-7 at ECF 5–6 (explaining that after a September 12, 2015 meeting between Barrett, Plaintiff, and Abshire about Abshire "bullying" Plaintiff, "no further allegations were received from" Plaintiff by Barrett); *see* dkt. 63-4 at ECF 47–48).

"A remedial action that effectively stops the harassment will be deemed adequate as a matter of law." *E.E.O.C. v. Xerxes Corp.*, 639 F.3d 658, 670 (4th Cir. 2011); *see id*. at 669 ("The cessation of harassment shows effectiveness, which in turn evidences . . . reasonable calculation"). Consequently, Plaintiff cannot succeed in establishing liability against Defendants for the hostile work environment created by Abshire between July and September 2015.

C.  **November 10th Statement by Joel Anderson**

Plaintiff seeks to impute liability to Defendants through a statement from Joel Anderson, the supervisor of Plaintiff's supervisor. (Dkt. 96 at 19–20).[4] Reliance on supervisory comments

---

[4] Plaintiff also cites two comments from Barrett—one admonishing her that "life is not fair" and another that UVA "does not like people complaining about discrimination"—as evidence of a hostile environment. But these remarks do not evince hostility to Plaintiff's race or national origin. (Dkt. 81 at 14). At most they reveal a supervisor's non-actionable "callous behavior" or general apathy to Plaintiff's plight. *Sunbelt Rentals, Inc.*, 521 F.3d at 319. To be sure, indifference from Barrett could have made *Abshire's* discriminatory remarks imputable to Defendants, had Barrett not acted to remedy them. *Id*. at 319; *Vance*, 133 S.Ct. at 2439. But Barrett did act, and in any event inaction on her part would not have transformed her statements of *indifference to another's* remarks into statements of racial and national origin hostility *by her*.

8

is important because, if they are severely or pervasively hostile, then they are directly attributed to the employer, subject to an affirmative defense. *Vance*, 133 S. Ct at 2441–42 (discussing *Faragher/Ellerth* defense and related doctrine). Plaintiff contends Anderson once told her that UVA had fired "many black nurses" over the years and that she would be neither the first nor the last one to be terminated.[5] (Dkt. 75-2 at ECF 72–73). To the extent the comment (which has nothing to do with Plaintiff's national origin) would create a hostile environment, Defendants nonetheless have an affirmative defense.

"The *Faragher/Ellerth* affirmative defense allows an employer to avoid strict liability for one employee's . . . harassment of another" when it does not, as here with Plaintiff's hostile work environment theory, result in tangible employment action. *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 265 (4th Cir. 2001). "This defense requires '(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *McKinney v. G4S Government Solutions, Inc.*, No. 16-1498, slip op. at 9–10 (4th Cir. Oct. 19, 2017) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

Defendants' moving brief sufficiently raised the *Faragher/Ellerth* defense. (Dkt. 93 at 13, 19–20). Plaintiff propounded no argument in response. (*See* dkt. 96 at 19–20). She therefore concedes the issue. *Alvarez v. Lynch*, 828 F.3d 288, 295 (4th Cir. 2016) (ignoring opponent's argument is "an outright failure to join in the adversarial process [that] ordinarily

---

[5] It merits mention that the Court has already ruled that Anderson's statement did not bear on Plaintiff's eventual termination, which occurred for legitimate, nondiscriminatory reasons: verbal threats she made and a refusal to cooperate with the investigation into a medical error. (Dkt. 81 at 6 & n.4, 8–9, 11–14). Indeed, Anderson was not the person who fired Plaintiff for those offenses, Barrett was. (*Id.*).

9

result[s] in waiver").[6]

Moreover, the evidence establishes the defense anyway. UVA has two written policies regarding discrimination, collectively known as "PADHR." (Dkt. 76-23 at ECF 5–23). PADHR sets forth UVA's standards for combating discrimination and harassment. It is "published throughout the University" in brochures and catalogs, posted online, and presented in trainings by the Office of Equal Opportunity and Civil Rights. (*Id.* at ECF 7, 11). The record further supports the conclusion that Plaintiff received specific counseling from the Director of Employee Relations on how to institute formal complaints in compliance with University policy. (Dkt. 63-7 at ECF 6). "'Distribution of an anti-harassment policy provides compelling proof that the company exercised reasonable care in preventing and promptly correcting . . . harassment,' and the 'only way to rebut this proof' is upon a showing that the employer adopted or administered the policy in bad faith or that the policy was otherwise defective or dysfunctional." *McKinney*, No. 16-1498, slip op. at 9–10 (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001)). As stated above, there is no argument (much less a showing) from Plaintiff that the exception to this presumption applies, so the first element is satisfied.

"Complaints under the PADHR Procedures must be in writing and filed with" the Office of Equal Opportunity Programs. (Dkt. 76-23 at ECF 16). The use of a standard PADHR "Complaint Form," which is posted online, is encouraged but not required, and several methods of submission are acceptable. (*Id.*). The Complaint Form requires identifying the "[r]espondent(s) - Name of Title of Person(s) Responsible" and his or her objectionable conduct. (Dkt. 93-8 at ECF 6). If the standard Complaint Form is not used, PADHR requires the

---

[6] *See Oliver v. Baity*, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016) ("Courts have recognized that a party's failure to address an issue in its opposition brief concedes the issue."); *Brand v. N.C. Dep't of Crime Control & Pub. Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004) ("By failing to respond, Plaintiff concedes that he has not stated a hostile work environment claim.")

complainant to identify the respondent and explain the allegedly improper actions. (Dkt. 76-23 at ECF 16).

Plaintiff lodged a written complaint to the Office of Equal Opportunity Programs on December 4, 2015. She used part of the PADHR Complaint Form, but attached to it a four-page narrative containing the substance of her complaint. Neither the Complaint Form nor the narrative statement contains any mention of Anderson or his November 10th statement. (Dkt. 93-8 at ECF 3, 5–12). This omission cements the *Faragher/Ellerth* defense.

The Fourth Circuit instructs that "any evidence that [the employee] failed to utilize [the company's] complaint procedure 'will normally suffice to satisfy [its] burden under the second element of the defense.'" *McKinney*, No. 16-1498, slip op. at 9–10 (quoting *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998) (alterations in original)). "In contravention of [UVA's] policy," Plaintiff failed to complain in writing to the Office of Equal Opportunity Programs that Anderson made to her the statement she now claims created a racially hostile environment. *Id*. An "employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (affirming judgment on *Faragher/Ellerth* defense where plaintiff "unreasonably failed to take advantage of an effective" harassment policy by "fail[ing] to report [her supervisor's] conduct"). As such, Defendants successfully have established the *Faragher/Ellerth* defense.

There is also significant doubt that Anderson's statement—two months *after* Barrett put the kibosh on Abshire's remarks by adjusting the shift schedules (dkt. 75-2 at ECF 72–73), thus making Defendants not vicariously liable for them—is sufficient to create a hostile work environment. While the law does not "require more than a single incident of harassment in every

11

viable hostile work environment case," if harassment is based on a supervisor's isolated statement, it needs "to be extremely serious." *Boyer-Liberto*, 786 F.3d at 280–81. For instance, the Fourth Circuit has held that a supervisor's single use of odious epithets like "porch monkey" or the n-word is "severe enough to engender a hostile work environment." *Id.* at 280; *see Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015) (holding that handful of anonymous, racist death threats "may not have been pervasive" but were "sufficiently severe" to create jury issue about existence of hostile environment).

While Anderson's isolated comment that UVA had no qualms about firing black nurses like Plaintiff does raise eyebrows, it is not comparable to the use of loathsome epithets like the n-word or "porch monkey," or the presence of racist death threats in the workplace. Other circumstances support the conclusion that the comment was not "extremely serious" so as to be severe. The statement came by phone when Plaintiff was off duty, not in person at the office. Anderson was not Plaintiff's direct supervisor. And he made the remark the day after receiving an investigative summary from the Director of Employment Relations, who concluded Plaintiff had repeatedly "voice[d] her concerns" and lodged "unfounded" "complaints," yet she "continue[d] to make unsubstantiated claims." (Dkt. 63-7 at ECF 1–2, 5–6).

## SUMMARY

Defendants' motion will be granted because Plaintiff cannot establish the existence of a hostile work environment that is attributable to Defendants. An appropriate order dismissing this case will issue. The pending jury trial is hereby **CANCELLED**. The Clerk is hereby directed to send a certified copy of this opinion and the accompanying order to counsel of record.

Entered this 24th day of October, 2017.

*[signature]*
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE